# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOE E. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 07 C 6020 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Joe Wilson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr. Wilson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Mr. Wilson applied for DIB on August 13, 2003[1], alleging that he had been disabled since February 1, 2002, as a result of hypertension, poor circulation, and a spot on his lung. (Administrative Record ("R.") 55-57, 74). His application was denied initially and upon reconsideration. (R. 39-44, 49-52). Mr. Wilson continued pursuit of his claim by filing a timely request for hearing on July 19, 2004. (R. 53).

---

[1] Even the simplest facts in these fact-intensive cases can be obscure. Mr. Wilson's application is dated August 6, 2003. (R. 55). He signed it on August 13, 2003. (R. 57). His brief says he applied for benefits on August 20, 2003. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment or Remand*, at 1). The Commissioner's brief says he applied on July 15, 2003. (*Defendant's Memorandum in Support of Commissioner's Motion for Summary Judgment*, at 1).

An administrative law judge ("ALJ") convened a hearing on December 15, 2005, at which Mr. Wilson, represented by counsel, appeared and testified. (R. 183-222). In addition, Mr. Wilson's wife testified. (R. 183, 197). On July 26, 2006, the ALJ issued a decision denying Mr. Wilson's application for DIB because he did not have a medically determinable impairment, or combination of impairments, that was severe as of the date he was last insured, March 31, 2002. (R. 13, 16-17). This became the final decision of the Commissioner when the Appeals Council denied Mr. Wilson's request for review of the decision on August 24, 2007. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Wilson has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).[2]

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Wilson was born on August 13, 1946, making him fifty-nine years old at the time of the ALJ's decision. (R. 17, 55). He is 5' 11" and weighs 210 pounds. (R. 74). He states that he completed 10 or 11 years of school, and has no high school degree. (R. 71, 74). From 1990 to 1997, he worked as a "palletizer" operator, loading pallets of soda

---

[2] Mr. Wilson filed a previous application in May 2000, which was ultimately denied following an administrative hearing by a different ALJ, who, on August 30, 2001, also found that Mr. Wilson had no severe impairment. (R. 32-36, 223-258). Mr. Wilson, who was represented by an attorney, did not seek review of that decision before the Appeals Council. Thus, that opinion stands as the final decision on his disability and is *res judicata* through the date of the decision. *See* 20 C.F.R. § 404.988; *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); *Groves v. Apfel*, 148 F.3d 809, 810-11 (7th Cir.1998).

pop onto skids. (R. 75). He had to lift cases of pop weighing up to 50 pounds. (R. 76). The job involved walking 4 hours a day and standing 8 hours a day. (R. 76). He stopped working when the company closed on August 1, 2007. (R. 75).

## B.
## Medical Evidence

The bulk of the medical evidence in this case consists of blood pressure readings and notations as to whether Mr. Wilson had taken his medication on the day of the reading. Little of the evidence comes from the period before Mr. Wilson's insured status expired on March 31, 2002. While the record indicates he has high blood pressure, there are no indications from any physician that this has resulted in any restrictions until well after the date Mr. Wilson was last insured.

On February 1, 2001, Mr. Wilson went to the Sengstacke Ambulatory Care Center to have his blood pressure checked – it was elevated at 198/116. (R. 121). He said he had taken his medication that day. (R. 121). Mr. Wilson went to the emergency room on April 25, 2001, complaining of abdominal and chest pains. (R. 131, 326). He denied any shortness of breath, nausea, or vomiting, and it appears that the chest and abdominal pain subsided in about 15 minutes. (R. 131, 332). His blood pressure was nearer to normal at 140/90, and cardiovascular exam was normal.[3] (R. 332). A stress test revealed no evidence of myocardial ischemia. (R. 337). He was discharged on April 27th in good condition with a final diagnosis of Chest wall pain, hypertension, and "chronic smoker." (R. 326, 328). Mr. Wilson was smoking a pack of cigarettes a day; he was told to stop. (R. 328, 332).

---

[3] Generally speaking, 120/80 or lower is considered normal blood pressure, while 140/90 or higher is considered hypertensive. A systolic reading of 120 to 139, or a diastolic reading of 80 to 89 is considered "prehypertension." http://www.nlm.nih.gov/medlineplus/highbloodpressure.html

On August 16, 2001, Mr. Wilson's blood pressure was 140/80. (R. 120). At that time, his treating physician since 1998, Dr. Painstill (R. 315; *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 10), completed a physical capacities evaluation. He noted that Mr. Wilson suffered from hypertension that was difficult to control, musculoskeletal back pain, and high cholesterol. (R. 318). Mr. Wilson's doctor thought he could sit, walk, or stand for six hours at a time during an eight-hour workday. (R. 319). He could frequently lift and carry up to 25 pounds, and occasionally lift and carry up to 50 pounds. (R. 319). He could bend, squat, crawl, climb, and reach frequently. (R. 319). Mr. Wilson had no limitations using his feet or hands. (R. 319).

Mr. Wilson walked to the emergency room on April 27, 2002, complaining of a knot – more of a boil – on the back of his neck. (R. 126-28). It was drained and he had no other complaints. (R. 128). His blood pressure was 144/90. (R. 128). On May 31, 2002, it was elevated at 190/108 on May 31, 2002. (R. 118).

Mr. Wilson had a stress test on October 17, 2002. At the time, it was noted that he had no documented history of heart disease. (R. 124). He exhibited a poor tolerance for exercise, and did not achieve a workload adequate for definitive results. (R. 124). He complained of chest pain during the test at a level of 3 out of 10, and the test was halted due to his shortness of breath. (R. 124). His pain resolved spontaneously. (R. 124). The following day, Mr. Wilson underwent a thallium rest and stress test, which was unremarkable. (R. 123).

On October 24, 2002, Mr. Wilson's blood pressure was high at 198/110. (R. 116). He had not taken medication for a week. (R. 116). He said he tired easily. (R. 116). Mr. Wilson's blood pressure was 160/88 on February 13, 2003, but he was off his

medication again. (R. 114). He said he became short of breath climbing one flight of stairs. (R. 114). He had smoked a pack of cigarettes the previous week. (R. 114). It was noted that a stress test was indeterminate, and a thallium test was negative. (R. 115). Peripheral pulses were decreased, and it was noted he might have peripheral vascular disease and he was given Ecotrin – safety coated aspirin. (R. 115). The doctor said Mr. Wilson "must quit smoking." (R. 115).

On March 27, 2003, his blood pressure was 149/77. (R. 168). Mr. Wilson complained of shortness of breath with exertion, but denied any syncope or palpitations. (R. 168). The impression was coronary artery disease and peripheral artery disease. (R. 168). Mr. Wilson's blood pressure was elevated at 191/96 on May 5, 2003. (R. 112). He claimed to have taken his medication that day. (R. 112). Thallium images were negative. (R. 112).

On May 16, 2003, his blood pressure was 150/80, but he was off his medication and failed to refill it. (R. 109). On June 23, 2003, Mr. Wilson sought follow-up for poor circulation in his legs. His blood pressure was 148/75. (R. 110). He said he got cramps in his right calf after walking half a block. (R. 110). Mr. Wilson's blood pressure was 160/90 on August 15, 2003. (R. 111). There was no edema and no pain. (R. 111). Once again, he was not taking his medication at that time. (R. 111).

On October 21, 2003, Mr. Wilson underwent another thallium stress test. His heart rate increased from 57 to 79, but his blood pressure dropped from 154/90 to 148/88. (R. 160). He exhibited no cardiorespiratory symptoms. (R. 160). There were ST-T changes in the baseline EKG. (R. 160). The test was called "[c]linically unremarkable," "inconclusive," and "nondiagnostic." (R. 160).

In December of 2004, Mr. Wilson fainted while at the clinic. (R. 139). He had taken two times the prescribed dosage of his hypertension medication. (R. 139). Later that month he reported that he had stopped taking Coreg and was having no problems. (R 137). His blood pressure was 150/80 on December 21, 2004. (R. 137).

On February 8, 2005 – about two years after Mr. Wilson's insured status expired – Dr. Peter Mayock, Mr. Wilson's treating physician since February of 2003, completed a residual functional capacity questionnaire for Mr. Wilson's attorney. (R. 132-35). His diagnoses were probable coronary artery disease, peripheral vascular disease, hypertension, high cholesterol, and tobacco use. (R. 132). He said Mr. Wilson's symptoms were chest discomfort, shortness of breath, and right calf pain with exertion. (R. 132). He suffered substernal chest pain at a level of 3 out of 10. (R. 132). The clinical findings Dr. Mayock cited were "inferior wall + thallium images with adenosine thallium." (R. 132).[4] He said Mr. Wilson took medication to control his blood pressure and cholesterol but, although prompted, did not mention any side effects. (R. 132). The doctor said that Mr. Wilson had pain or other symptoms – he did not specify – that interfered with his attention or concentration frequently. (R. 133). He said Mr. Wilson could not tolerate even "low" work stress. (R. 133). Dr. Dr. Mayock felt Mr. Wilson could sit or stand for two hours at a time, and could sit, stand, or walk for a total of six hours per eight-hour work day. (R. 133). Mr. Wilson would not need to change positions during the day, nor would he need unscheduled breaks. (R. 134). He could only rarely lift and carry ten pounds. (R. 134). He could not climb stairs, and could only

---

[4] It is unclear what thallium tests Dr. Mayock was referencing, as those in the record were "nondiagnostic" or "unremarkable."

rarely twist, bend, or crouch. (R. 135). He had no limitations on his ability to reach or manipulate. (R. 135).

**C.**
**Administrative Hearing Testimony**

**1.**
**Plaintiff's Testimony**

Mr. Wilson testified that his last job ended when the soda pop company he had been working for folded in 1997 or 1998. (R. 189-90). He said he looked for work after that but could not pass a physical at the steel mill. (R. 190). He said he took medication to control his hypertension "but they're steady changing my medication . . ." (R. 192). Mr. Wilson stated that he had a heart attack in April of 2001, but did not recall how he was treated other than being admitted into the hospital. (R. 193). He also has a problem with his legs that he thought began near the end of 2001. (R. 193). That was worse now (in December 2005) than it was when it started. (R. 193). He can walk just a half block before he has to stop to rest. (R. 193). He last had health insurance in 1998. (R. 194).

He said he used to be able to mow the lawn, but had to stop a couple of years ago – perhaps 2003. (R. 195). Now he and his wife have a service do it. (R. 195). He stopped painting about the same time he stopped cutting the grass. (R. 195). He has no hobbies. (R. 196). He used to shoot pool, but now it requires too much standing. (R. 196). Standing and walking make the calves of his legs "harden up." (R. 202). That started at the end of 2001 or 2002. (R. 202). He said that he also experiences pain while he is sitting. (R. 206). It was unclear whether this was in his neck (R. 204), his back, or his waist. (R 204-05). It was relieved by getting up and moving around. (R. 207). He related that this pain made it difficult to concentrate. (R. 207).

Mr. Wilson testified that he is dizzy nearly every morning, but it was not as bad back in 2001 or 2002. (R. 210). It went away after 15 or 20 minutes, and would only return later in the day every once in a while. (R. 211).

## 2.
## Plaintiff's Wife's Testimony

Mr. Wilson's wife, Juanita said that she and her husband began using the lawn service in the summer of 2003. (R. 198). Sometimes her husband became short of breath using the stairs. (R. 198). He has not been able to take out the garbage for a couple of years. (R. 199). When he tried to do work around the house, he would tell her that his legs were giving out on him. (R. 201).

## III.
## THE ALJ'S DECISION

The ALJ found that Mr. Wilson had not engaged in substantial gainful activity since his alleged onset date of February 1, 2002. (R. 13, 16). He further found that Mr. Wilson had sufficient quarters of coverage to be insured for the purposes of DIB up tp March 31, 2002. (R. 13). As such, he had to establish that he was disabled by that date. (*Id.*). The ALJ then reviewed Mr. And Mrs. Wilson's testimony, including Mr. Wilson's claim that he suffered a heart attack on April 25, 2001, and that he could lift no more that 20 pounds and walk no farther than half a block. (R. 15). After reviewing the medical evidence, the ALJ concluded that Mr. Wilson did not have a severe impairment. (R. 16-17).

The ALJ stated that his finding was supported by unremarkable thallium scans and a non-diagnostic stress test. (R 16). He noted that the hospital records from April 2001 show that Mr. Wilson complained of chest pains, but there was a low probability of

a myocardial infarction. (R. 16). There was also a negative stress test at that time and advice to give up smoking. The ALJ said that he evaluated Mr. Wilson's hearing testimony under the criteria listed in the regulations and SSRs 96-4p and 96-7p, including the objective medical evidence. (R. 16). He noted that Mr. Wilson had complained to physicians of pain after prolonged walking or no pain at all. (R. 16). The record also showed that Mr. Wilson was able to mow his lawn through at least 2002. (R. 16).

The ALJ also considered the opinion of Mr. Wilson's treating physician that he was incapable of even low stress jobs. (R. 16). But Mr. Wilson had not seen this doctor until nearly a year after his insured status expired. (R. 17). Furthermore, the doctor did not diagnose Mr. Wilson with coronary artery disease or provide his opinion that Mr. Wilson was so restricted until 2005. (R. 17). Having found that Mr. Wilson did not have a severe impairment before his insured status expired, the ALJ concluded that he was not disabled under the Act. (R. 17).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th

Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

## B.
### Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day,* 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue,* 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe,* 425 F.3d at 352. Here, the ALJ determined at step two that Mr. Wilson did not have a severe impairment before his insured status expired.

## C.
## Analysis
## 1.
## The Plaintiff Has Not Met His Burden Of Proving
## He Had A Severe Impairment Before His Insured Status Expired

The starting point of this analysis is the date upon which Mr. Wilson's insured status expired, March 31, 2002. Mr. Wilson has the burden of establishing disability before his date last insured ("DLI"). *Briscoe*, 425 F.3d at 348; *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998). The burden is his to prove his impairment was severe as well. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Mr. Wilson argues that, at the very least, the evidence establishes that he suffered from a severe impairment prior to his DLI, and that the ALJ was wrong to conclude otherwise.

An impairment or combination of impairments is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities include, among other things: walking, standing, sitting, lifting, pushing, reaching, carrying, handling; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, *3; *Yuckert*, 482 U.S. at 153.

The objective medical evidence leading up to Mr. Wilson's DLI, as already noted here and as discussed by the ALJ, consists mainly of blood pressure readings, some

elevated despite medication, some near normal, some elevated without medication. There are also non-diagnostic or unremarkable thallium stress and rest tests. That, essentially, is it. So while the evidence demonstrates that Mr. Wilson suffered from hypertension, it says nothing about its affect on his ability to work. It is not enough to simply establish a diagnosis with a date of onset prior to the expiration of the insured period, because an impairment is not always disabling. *Estok*, 152 F.3d at 640. What is missing here is evidence that Mr. Wilson's blood pressure significantly limited his ability to perform basic work activities.

Mr. Wilson submits that he checked into the hospital on April 25, 2001, complaining of pain, nausea, and shortness of breath, "which was determined to be a possible myocardial infarction." (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 10-11). Actually, Mr. Wilson *denied* any shortness of breath and denied any "N\V" – nausea or vomiting. (R. 131).[5] Upon admission, it was noted that he had a low probability of having suffered a heart attack (R. 326), but this was ruled out through exams and tests. (R. 332, 337). The final diagnosis was simply chest pain and hypertension, and Mr. Wilson was discharged in good condition and told to stop smoking. (R. 328).

Mr. Wilson also points to his treating physician's assessment of his capacity for work. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 10). Significantly, just a few months before his insured status expired, Mr. Wilson's treating physician, Dr. Painstill, well aware of his impairments over the course of a few years,

---

[5] At another point in the records associated with this hospitalization, it is noted that Mr. Wilson had abdominal pain "associated with *some* nausea, *no vomiting or shortness of breath* or diaphoresis." (R. 332)(emphasis supplied).

opined that he could walk and/or stand for six hours out of every workday, and carry 50

pounds occasionally and 25 pounds frequently. He had no other limitations on his ability

to work. That equates to a capacity for medium work under the Commissioner's

regulations. 20 C.F.R. § 404.1567(c). Given the sequential evaluation, even such a

substantial capacity for work may not equate to a non-severe impairment, but it certainly

equates to not much of one. The Commissioner's regulations elaborate on the capability

to perform medium work as follows:

> The functional capacity to perform medium work represents such
> substantial work capability at even the unskilled level that a finding of
> disabled is ordinarily not warranted in cases where the individual retains
> the functional capacity to perform medium work. Even the adversity of
> advanced age (55 or over) and a work history of unskilled work may be
> offset by the substantial work capability represented by the functional
> capacity to perform medium work.

20 C.F.R. Pt. 4040, Subpt. P, App. 2, §203.00(b). That is exactly Mr. Wilson's situation:

a substantial work capability.

Again, a capacity for medium work does not necessarily equate to a finding of

"no severe impairment," but suppose the ALJ uncritically accepted the opinion of Mr.

Wilson's treating physician that Mr. Wilson could perform medium work before the

expiration of his insured status. After all, as a treating physician, Dr. Painstill has a

familiarity and longitudinal view of Mr. Wilson's condition that would ordinarily entitle

his opinion to controlling weight. 20 C.F.R. § 404.1527(d)(2); *Hofslien v. Barnhart*, 439

F.3d 375, 376-77 (7th Cir. 2006); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004).

Based on the assessment of Mr. Wilson's treating physician, the Commissioner's

Medical-Vocational Guidelines, or "Grid," would direct a finding that Mr. Wilson was

not disabled given his capacity for medium work, his age (whether considered advanced

(59) or closely approaching retirement age (60-64)); 20 C.F.R. § 404. 1563(e)), his education (limited; 20 C.F.R. § 404.1564(b)(3)), and unskilled work experience. 20 C.F.R. Pt. 4040, Subpt. P, App. 2, Rules 203.03, 203.11.

Recall the definition of severe impairment found in SSR 85-28 and *Yuckert*, both cited by Mr. Wilson: a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work *even if the individual's age, education, or work experience were specifically considered.* That would appear to be the case here, given what Dr. Painstill thought about the effect – minimal at best – Mr. Wilson's impairment had on his capacity for work. Again, a capacity for medium work and not having a severe impairment are not necessarily the same thing, but a claimant's physician finding such minimal restrictions is certainly meaningful. At the very least, when the objective medical evidence and Dr. Painstill's opinion are considered, it must be said that there is substantial evidence in the record to support the ALJ's determination that Mr. Wilson did not suffer from a severe impairment before his DLI.

Substantial evidence, again, is not even a preponderance of evidence, but merely more than a scintilla of evidence. *Schmidt*, 496 F.3d at 841-42. The reviewing court need not even agree with the ALJ's conclusion – so long as reasonable minds might differ as to whether the claimant is disabled, the ALJ's decision must be upheld. *Id.* at 842. Reasonable minds may differ here, but there is more than a scintilla of evidence to support the ALJ's conclusion.

Mr. Wilson also argues that the ALJ was wrong about his not having a severe impairment because he failed to investigate Mr. Wilson's coronary artery disease. He

15

points out that clinical notes dated March 27, 2003, stated that Mr. Wilson's shortness of breath and chest pain strongly suggested coronary artery disease (R. 168), and he was diagnosed with artherosclerotic heart disease in December 2005 (R. 180). (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 10-11). A strong suggestion is not a diagnosis of a coronary artery disease, although it is a stronger suggestion than was the admitting note stating "low probability of a myocardial infarction." The notes from December 2005 are mostly illegible, but do seemingly at least mention "artherosclerotic disease;" they also indicate that Mr. Wilson's blood pressure was normal at 112/71, and that his hypertension was "well-controlled." (R. 180). Even accepting Mr. Wilson's translation of these hieroglyphics, however, the "diagnosis" of artherosclerotic disease does not appear until nearly two years after his DLI, which is too late. *Briscoe*, 425 F.3d at 348; *Estok*, 152 F.3d at 640. To the extent either jotting can be considered a pertinent diagnosis, they would be no more than that: diagnoses. That is insufficient to meet Mr. Wilson's burden of establishing a severe impairment prior to his DLI. *Estok*, 152 F.3d at 640.

Mr. Wilson goes on to contend that, because of these diagnoses, it was incumbent upon the ALJ to develop the record further and investigate this impairment. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 11). It is true, as Mr. Wilson argues, that disability benefits hearings are "inquisitorial rather than adversarial" and ALJs must "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). As such, the ALJ has a duty to develop a full and fair record. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). But in a case like this, where a

16

claimant is represented by counsel, an ALJ is entitled to presume that he has made his best case for his entitlement to benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). A dearth of medical evidence to support a claim for disability does not necessarily trigger a heightened duty on the ALJ's part; it may simply mean the claimant has failed to prove his case. *See Skinner*, 478 F. 3d at 844 ("The ALJ was highlighting the lack of objective medical data to support Skinner's claimed disability and the predominance in the record of Skinner's own subjective complaints; he was not commenting on a gap in the medical evidence that a consultative examination would have filled."). Mr. Wilson was represented by an attorney at his hearing, as he was at his prior hearing. Nothing in Mr. Wilson's brief supports the contention that the ALJ ought to have done more than he did.

The cases Mr. Wilson cites are not helpful. In *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000), the court found that the ALJ should have ordered additional medical evidence where the only x-rays in the record were dated *ten years* before the hearing, and demonstrated the early stages of a degenerative disease. 231 F.3d at 438. Mr. Wilson's situation is quite different. His file has medical evidence contemporaneous with the period in which he has to establish he became disabled. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) dealt with 20 C.F.R. § 404.1527(c)(3), which states that an ALJ will obtain additional evidence when there is not enough in the record to determine whether the claimant is disabled. 381 F.3d at 669. Here, there was, but it simply did not indicate that Mr. Wilson suffered from a severe impairment.

A third case not cited by Mr. Wilson might be instructive. In *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003), a case involving a DLI issue, there was a report

17

from the claimant's physician dated two weeks after the expiration of his insured status that he had begun to lose control of his grip. The ALJ simply ignored the evidence, and the Seventh Circuit ruled that the ALJ should have investigated as to when this limitation began. 322 F.3d at 918. In this case, the medical record makes no mention of any such limitation at any point before Mr. Wilson's DLI or up to three years thereafter. In fact, Mr. Wilson's treating physician said he had a substantial capacity for performing work.

Mr. Wilson presented his evidence: some elevated blood pressure readings, non-diagnostic or unremarkable cardiac tests, and his doctor's opinion that he could carry 50 pounds occasionally, carry 25 pounds frequently, and sit, stand, or walk for six hours at a time. His argument can be distilled to this: "I have a diagnosis, but no indication that I am restricted in any way aside from my treating physician's opinion that I am barely restricted at all. I am represented by an attorney. ALJ, it is up to you to produce evidence that I was disabled over four years ago." If that is all it took to obligate an ALJ to order additional medical examinations, it would truly have disastrous results for a program that sees over a half-million administrative hearings a year. *Rogers v. Barnhart*, 446 F.Supp.2d 828, 833 n.2 (N.D.Ill. 2006).

Every diagnosis of arthritis, diabetes, high blood pressure, or anything else, accompanied by a physician's statement that the individual could do physically demanding work would send the Agency on a fruitless and costly search for evidence of a disability the claimant's doctor did not even think his or her patient had. If it be true that "[t]he soundness of a conclusion may not infrequently be tested by its consequences," Richard Posner, Cardozo: A Study in Reputation, 118 (1990), the argument must be rejected.

Mr. Wilson also argues that the ALJ was required to consult a medical expert in this case under SSR 83-20. (*Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 13). The ruling is inapplicable here, as it deals with instances where an individual is found disabled but the issue is when that disability began. *See Briscoe*, 425 F.3d at 352; Scheck, 357 F.3d at 701 ("The ALJ did not find that [the claimant] was disabled, and therefore, there was no need to find an onset date. In short, SSR 83-20 does not apply."). In any event, "SSR 83-20 does not free [Mr. Wilson] from h[is] burden to prove disability within the meaning of the Act." *Briscoe*, 425 F.3d at 356.

## 2.
### The ALJ's Credibility Assessment Was Not Patently Wrong

Mr. Wilson's final argument concerns the ALJ's treatment of his testimony. An ALJ's credibility assessment will stand if it is not "patently wrong" and "as long as [it] find[s] some support in the record." *Berger*, 516 F.3d at 546; *Schmidt*, 496 F.3d at 843. Mr. Wilson submits that the ALJ did not make a proper credibility finding because he failed to follow SSR 96-7p and improperly disregarded his complaints based on the objective medical evidence. But the ALJ specifically stated that he considered the factors listed in SSR 96-7p, as well as the objective medical evidence. He discussed that evidence – which, as the foregoing discussion demonstrates, was minimal at best – along with Mr. Wilson's testimony. That is sufficient. *See Schmidt*, 496 F.3d at 843-44 (upholding credibility finding where ALJ stated he considered SSR 96-7p factors, summarized the record and testimony, and found claimant's complaints were not supported by objective medical evidence).

Beyond that, Mr. Wilson argues that the ALJ dismissed objective medical evidence of his peripheral vascular disease limiting his ability to walk. This first appeared, however – as Mr. Wilson concedes – a year after the expiration of Mr. Wilson's insured status. (R. 115; *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, at 14). At that time, it necessitated no more than an aspirin a day as treatment. That does not mean that the disease might not have been present at an earlier date. But prior to that, and prior to Mr. Wilson's DLI, his treating physician indicated there was nothing that prevented him from walking or standing six hours a day. As the ALJ noted, it was not until nearly two years after the expiration of Mr. Wilson's insured status that any physician found ay significant limitations on his capacity for work stemming from his impairments. *See Briscoe*, 425 F.3d at 356 ("Even if it is possible to infer that peripheral vascular disease was present [earlier] . . . there is no evidence to indicate that the disease had progressed so far so as to prevent him from engaging in any substantial gainful activity.").

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#25] is DENIED, and the Commissioner's motion for summary judgment [#27] is GRANTED.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 4/15/09